**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

LORIE A. SMILEY,

    Plaintiff,                                        Case No. 06-13403

vs.                                                 DISTRICT JUDGE MARIANNE O. BATTANI
                                                         MAGISTRATE JUDGE STEVEN D. PEPE

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

    Defendant.
_____/

**REPORT AND RECOMMENDATION**

**I. BACKGROUND**

Lorie A. Smiley brought this action under 42 U.S.C. § 405(g) and § 1383(c)(3) challenging a final decision of the Commissioner denying her application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act. Both parties have filed motions for summary judgment which have been referred for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C). For the following reasons, it is Recommended that Plaintiff's Motion for Summary Judgment be DENIED, and Defendant's Motion for Summary Judgment be GRANTED

    **A.    Procedural History**

In March 2003, Plaintiff filed an application for SSI, claiming disability since January 1, 1999 due to diabetes, poor vision and blood circulation, and carpal tunnel syndrome (R. 48, 62). Her earnings record shows that she last worked sometime in 2000 (R. 57-58). Plaintiff's claim was denied upon initial review (R. 23), and she requested an administrative hearing. At the August 31, 2005, hearing Plaintiff was represented by an attorney and testified as did

vocational expert Jennifer Turecki (VE) (R. 12). ALJ Burgchardt issued her opinion on February 24, 2006, concluding that Plaintiff was not disabled because, despite her impairments, she retains the ability to perform a significant range of light work (R. 17).

### B. **Background Facts**

#### 1. Plaintiff's Testimony

*Disability Application*

Plaintiff indicated she suffered from diabetes, poor vision and circulation, and carpal tunnel syndrome (R. 62). These conditions limited her ability to work in that she was unable to do any heavy lifting or to stand for long periods of time (R. 62). The symptoms began to bother her on January 1, 1999, and she became unable to work on that date, though she noted she actually did work as a home health aide until sometime in 2000 (R. 63). Previously, she worked as a school noon hour aide (R. 63). She saw a doctor for her diabetes, carpal tunnel syndrome, vision, and circulation problems, and was taking medication as treatment.

*Hearing Testimony*

Plaintiff was 44 years old at the time of her ALJ hearing (R. 145). She suffered from carpal tunnel syndrome, migraine headaches, and painful arthritis in both knees (R. 147-48). She also had diabetes, which caused vision problems, and she also complained of a fluttering in her heart (R. 151, 162). At the time of her hearing, she was taking Elavil for the carpal tunnel, Motrin for the pain in her knees, aspirin for the heart fluttering, 70/30 insulin, Vytorin for cholesterol, and Lipithoid for her thyroid (R. 157). ALJ Burgchardt confirmed that the Elavil was used to treat the pain from carpal tunnel, and not to treat her depression (R. 157). Plaintiff

denied suffering from depression at the hearing (R. 163). She stated that she does not smoke, drink alcohol or take illegal drugs (R. 153).

In 2000, Plaintiff worked for her mother as a home health aide until her mother's death (R. 147). This was her last work experience (R. 147). She had previous part-time work experience as a school noon hour aide and as a janitor (R. 158-59). Plaintiff had a high school degree and had received assembly line training from Chrysler (R. 145).

Plaintiff lived in a condominium with her son (R. 154), who was five years old and just beginning kindergarten (R. 159-60). Her daughter visited each day, bringing along Plaintiff's two grandchildren (R. 154). Plaintiff stated that, while she may be able to fix a bowl of cereal, her daughter handled all the "heavy cooking" (R. 161). Her daughter also helped with the cleaning and did Plaintiff's shopping, although, on occasion, Plaintiff might accompany her (R. 161-62). Plaintiff did do her own laundry (R. 160). Plaintiff watches television (R. 151), on occasion goes to church, and sometimes takes her son and grandchildren to the park (R. 156), but is otherwise not able to do anything she previously enjoyed doing (R. 153).

Plaintiff estimated that she can sit for 20 or 30 minutes without changing positions, stand for approximately 15 to 20 minutes, and walk half of a block (R. 149-50). Although it would be painful, she stated that she could pick up a piece of paper lying on a desk, but that she had problems with her hands and had been dropping things (R. 150). She claimed it would hurt her to lift a gallon of milk (R. 150). Her headaches, which she said result from a 1985 surgery to put a metal plate in her skull (R. 148), occurred daily and lasted for two hours (R. 151). Because of her poor vision, which is characterized by seeing floating black spots, she required a magnifying glass to read (R. 152).

## 2. **Medical Evidence**

*Physical Examinations*

In June 2003, Plaintiff underwent a physical examination by P. Patel, M.D. (R. 98). Dr. Patel's report stated that Plaintiff had a past medical history of peripheral vascular disease, arthritis in her left knee, carpal tunnel syndrome, and diabetes mellitus (R. 98). At her examination, she was able to get on and off the examination table, and had normal ranges of motion in the cervical spine, shoulders, elbow, hips, right knee, ankles, hands and fingers (R. 99). The ranges of motion in her left knee were limited. Dr. Patel noted crepitus in that same knee. She had diminished pulses in her right foot. Her heartbeat was regular, and no murmur, rub or gallop was detected. Strength and deep tendon reflexes were within normal limits and sensation was intact except in Plaintiff's left lower extremity . She leaned to the right and lifted her left lower extremity while walking, but did not use any assistive device.

After his examination of Plaintiff, Dr. Patel diagnosed peripheral vascular disease, based on the diminished pulses in her right foot. He also relied on her statements that she has poor circulation and experiences cramping in her calves when walking; he found the cramps to be consistent with claudication (R. 98-99). Yet, he noted that she had not had Doppler tests done to make this diagnosis . He also diagnosed arthritis in her left knee, based on her complaint of pain and swelling; bilateral carpal tunnel syndrome, based on her complaint of difficulty with fine motor movements; and diabetes mellitus . Plaintiff tested her blood levels at home, and Dr. Patel noted that the reported results ran high.

In July 2003, a state agency physician (whose name is illegible), prepared a Physical Residual Functional Capacity Assessment by reviewing Plaintiff's medical record (R. 112). He

determined that Plaintiff could occasionally lift and carry 50 pounds and frequently lift and carry 25 pounds (R. 113). If she were allowed normal breaks, he concluded that she would be able to sit or stand/walk for six hours in an eight-hour work day (R. 113). He limited her to climbing, balancing, kneeling and crawling only occasionally, and to stooping and crouching frequently (R. 114). The physician concluded that the severity or duration of Plaintiff's symptoms was disproportionate to the expected severity or expected duration on the basis of her medically determinable impairments (R. 117).

An electromyography report completed in August 2005 showed a moderate neuropathy at the right wrist and a mild neuropathy at the right elbow (R. 139-40). The examiner, noting that Plaintiff reported symptoms of left carpal tunnel syndrome and peripheral neuropathy, recommended that Plaintiff be referred for left upper and bilateral lower extremity studies (R. 140).

### *Mental Examinations*

In July 2003, Plaintiff was examined by psychiatrist A. Kumar (R. 105). Plaintiff told Dr. Kumar that she had never been hospitalized for a psychiatric condition and was not currently seeing a psychiatrist (R. 105). Although she got along with her family, Plaintiff told him that she did not like to associate with people and liked to be alone (R. 105). She stated she had trouble sleeping and that her appetite was poor (R. 105). Dr. Kumar noted that Plaintiff suffered from low self-esteem and feelings of helplessness, and had signs of psychomotor inhibition (R. 105). At the examination, her affect was blunted and she had a depressed and anxious mood, though he found her speech to be coherent and her thoughts to be fairly well-organized (R. 105). She was able to repeat two digits forward and two digits backward, and to remember two out of three

5

items three minutes later (R. 106). After his examination of Plaintiff, Dr. Kumar diagnosed depressive disorder and a history of a learning disability, and assigned a global assessment of functioning (GAF) score of 45 (R. 107).[1]

In September 2003, Dr. Kumar's findings were reviewed by a state agency psychologist, James Tripp, Ed.D, who then assessed the limitations caused by Plaintiff's mental impairments (R. 125). Dr. Tripp found that while Plaintiff was moderately limited in her ability to understand, remember, and carry out detailed instructions, she was not significantly limited in any of the other areas of work-related mental activity assessed (R. 121-22). One of these areas was the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; in this area, too, Dr. Tripp noted that Plaintiff was not significantly limited (R. 122). Yet, in another form completed the same day, he noted that she had moderate difficulties in maintaining concentration, persistence, or pace (R. 135). Dr. Tripp concluded that Plaintiff was able to do simple, sustained, unskilled work; that her activities of daily living were not limited; and that her mental state was moderately limited due to depression (R. 123).

---

[1] The GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning." AMERICAN PSYCHIATRIC ASSOC., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, (4th ed.1994) at 30. It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *See id.* at 32. A GAF score of 31-40 indicates "some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas such as work or school, family relations, judgment, thinking or mood." *Id.* A GAF of 41 to 50 means that the patient has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)." *Id.* A GAF rating of 51 to 60 signals the existence of moderate difficulty in social or occupational functioning. *Id.*

### 3. **Vocational Evidence**

Jennifer Turecki testified as a vocational expert (VE) at Plaintiff's hearing. The ALJ posed to VE Turecki three hypothetical scenarios.

First, the ALJ asked VE Turecki the following hypothetical: a person of Plaintiff's age, education, and past work experience; requiring simple and unskilled work; able to lift or carry 10 pounds frequently and 20 pounds occasionally; able to sit or stand/walk with normal breaks for six hours in an eight-hour work day; able to perform pushing or pulling motions with upper and lower extremities, within the given weight restrictions; no vibrations; only occasionally performing postural activities (climbing, balancing, stooping, crouching, kneeling, and crawling); and limited to only occasional bilateral manual dexterity for fine manipulation (R. 166).

VE Turecki responded that there were jobs at the light, unskilled level that such a person could perform, including 3,500 hand packer positions, 2,000 sorter positions, 1,400 usher positions, and 1,800 inspector positions (R. 166). When asked by the ALJ to confirm that the hand packer and sorter positions would accommodate the limitations on fine manipulation, VE Turecki responded that they would (R. 166).

Second, the ALJ posed the following hypothetical: a person of Plaintiff's age, education, and past work experience; requiring simple and unskilled work; able to lift or carry small articles frequently but up to 10 pounds only occasionally; able to stand or walk with normal breaks for a total of two hours in an eight-hour work day; able to sit with normal breaks for six hours in an eight-hour work day; able to perform pushing or pulling motions with upper and lower extremities, within the given weight restrictions; limited in activities requiring bilateral manual

dexterity for fine manipulation to only occasional; no vibrations; and only occasionally performing postural activities (climbing, balancing, stooping, crouching, kneeling, and crawling) (R. 167).

In response to this second hypothetical, VE Turecki stated that there were jobs at the sedentary level that such a person could perform, including 1,700 information clerk positions, 1,500 surveillance system monitor positions, and 1,500 telephone quotation clerk positions (R. 167).

Third, the ALJ asked VE Turecki the following hypothetical: a person of Plaintiff's age, education, and past work experience, who, due to a combination of impairments, is unable to sustain concentration, persistence, and pace necessary to consistently fulfill work for eight hours a day, five days a week (R. 167-68). VE Turecki responded that there would be no competitive employment for such an individual (R. 168).

### 4. **ALJ Burgchardt's Decision**

ALJ Burgchardt found that Plaintiff had not engaged in any substantial gainful activity since sometime in 2000 (R. 19). She also found that Plaintiff had unskilled past relevant work, was a "younger individual" within the meaning of 20 C.F.R. § 416.963, and had a high school education (R. 19).

Plaintiff's right carpal tunnel syndrome since August 2005, possible peripheral neuropathy in her legs, and migraine headaches were considered "severe" based on the requirements in 20 C.F.R. § 416.920(c), but did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, and Regulation No. 4 (R. 19). Her alleged mental

disability was not considered "severe" because Plaintiff was not receiving any mental health treatment and was not on any psychiatric medications (R. 16).

The allegations made by Plaintiff regarding her limitations were not totally credible because of a lack of substantiating medical evidence (R. 16, 19). Plaintiff's attorney requested two separate 30-day extensions to provide additional medical records, most recently on October 1, 2005, but no documents were received after that date (R. 16).

ALJ Burgchardt found that Plaintiff had the residual functional capacity (RFC) to perform a significant range of light work, though, due to her exertional limitations, not all jobs within that category. Using the Medical-Vocational Guidelines as a framework, ALJ Burgchardt determined that there were a significant number of jobs Plaintiff could perform in the national economy, referring to the jobs identified by VE Turecki at the light, unskilled level and the sedentary level. Thus, Plaintiff was found not to be disabled.

## II.    ANALYSIS

### A.    Standards of Review

In adopting federal court review of Social Security administrative decisions, Congress limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence. See 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and Human Servs.,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a

different conclusion. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

B. <u>**Factual Analysis**</u>

Plaintiff puts forth several arguments in her request for review. First, she contends that the Vocational Expert's testimony that certain positions can be performed by an individual with Plaintiff's RFC was incorrect. Second, she argues that the ALJ improperly discounted the assessment of a state reviewing psychologist that Plaintiff had moderate difficulties in maintaining concentration, persistence, and pace, and instead substituted her own psychological assessment that Plaintiff only had mild difficulties in this area. This distinction, Plaintiff argues, is important because the Vocational Expert testified that there is no competitive employment available for an individual who is unable to maintain concentration, persistence, and pace. Third, Plaintiff contends that the lack of medical evidence, which played a substantial role in the ALJ's decision, was due both to her inability to afford treatment and to the ALJ's failure to properly develop the record.

Plaintiff's first argument is that the ALJ incorrectly found that she could perform the jobs of hand packager, sorter, inspector, and telephone clerk. The ALJ's residual functional capacity assessment was that Plaintiff was limited to only occasional activities requiring bilateral manual dexterity, and she included this limitation in the hypothetical questions posed to the vocational expert. Plaintiff does not challenge the RFC here, but rather contends that all of these jobs require more than occasional bilateral manual dexterity.

The testimony of a vocational expert "concerning the availability of suitable work may constitute substantial evidence where the testimony is elicited in response to a hypothetical

10

question that accurately sets forth the plaintiff's physical and mental impairments." *Smith v. Halter*, 307 F.3d 377, 378 (6th Cir. 2001). When asked by the ALJ for light level positions that accommodated a limitation to only occasional bilateral manual dexterity, VE Turecki testified to the existence of the positions of hand packer, sorter, usher, inspector, and checker (R. 166). The ALJ asked for confirmation on the hand packer and sorter positions, and VE Turecki again stated that these positions would accommodate the limitations on fine manipulation (R. 166). Because the responses were given to an accurate hypothetical question, they constitute substantial evidence. There is no reason warranting a reversal on this point.

Plaintiff next argues that the ALJ improperly substituted her own judgment as to Plaintiff's psychological capabilities for that of the Disability Determination Services (DDS) psychologist, Dr. Tripp. In reviewing Plaintiff's psychological record, Dr. Tripp was first asked to evaluate Plaintiff's capacity for sustained concentration and persistence by checking appropriate boxes on a Mental RFC Assessment form. He concluded that, though she was moderately limited in her ability to understand, remember, and carry out detailed instructions, she was not significantly limited in her abilities to "maintain concentration for extended periods," "sustain an ordinary routine without special supervision," and "perform at a consistent pace in a normal workweek" (R. 121-22). When he was asked for his assessment of Plaintiff's difficulties in "maintaining concentration, persistence, and pace" on a Psychiatric Review Technique form, though, he checked the box for a moderate degree of limitation (R. 135). Despite this apparent discrepancy in box-checking, Dr. Tripp handwrote, in narrative form, his final conclusion: "The Claimant is able to do simple, sustained, unskilled work" (R. 123). The ALJ stated that she "basically agrees with Dr. Tripp's conclusions regarding the claimant's

11

mental limitations, except she has mild difficulties in maintaining concentration, persistence, or pace" (R. 16).

Given Dr. Tripp's ultimate conclusion that Plaintiff could do simple, sustained, unskilled work, and his earlier finding of no significant limitations on her concentrating for extended periods, there is substantial evidence to uphold the ALJ's finding that Plaintiff's concentration limitations are mild.

In two of her three hypothetical questions to the Vocational Expert, the ALJ included as part of her RFC assessment Dr. Tripp's conclusion that Plaintiff was able to perform simple, unskilled work. VE Turecki testified both times that jobs existed for an individual with this limitation. In the ALJ's third hypothetical, she put aside Dr. Tripp's assessment and asked the Vocational Expert if jobs existed with someone "unable" to maintain concentration, persistence, and pace. Yet, there was no evidence in the record to support this RFC. Plaintiff herself did not point to evidence suggesting she had any additional mental limitations. She consistently maintained that her inability to work was based on physical impairments (R. 62, 147-49). Indeed, she denied even being depressed (R. 163). And, as noted, Dr. Tripp, despite inconsistencies in his review, concluded that Plaintiff could perform simple, unskilled work. The ALJ, therefore, did not improperly substitute her own judgment for Dr. Tripp's; rather, in the absence of any other evidence, she followed the clearest indication Dr. Tripp provided of his final assessment. A reversal on this point is not warranted.

Plaintiff's final argument finds two errors in the ALJ's issuance of her determination despite the lack of objective medical evidence. First, Plaintiff contends that she was unable to

afford medical treatment, but that this should not preclude a finding of disability. Second, Plaintiff states that the ALJ had a duty to develop the record and failed to do so.

The ALJ discounted Plaintiff's complaints as "not very credible" due, in part, to her lack of medical treatment (R. 17). Specifically, the ALJ noted that Plaintiff was not receiving any treatment for her carpal tunnel syndrome (R. 16). Plaintiff now argues that she is not undergoing remedial treatment because she is unable to afford it and does not have medical insurance (Plaintiff's Brief at 8).

An inability to afford treatment is a justification for failing to obtain treatment. *See*, *e.g.*, *McKnight v. Sullivan*, 927 F.2d 241, 242 (6th Cir. 1990). Social Security Ruling 82-59 provides that "an individual's failure to follow prescribed treatment . . . [will] not preclude a finding of 'disability' [when] . . . the individual is unable to afford prescribed treatment which he or she is willing to accept, but for which free community resources are unavailable." The ruling also requires that the treatment be prescribed by a treating source, and notes that a DDS staff physician or a consulting examiner is not considered a treating source. Thus, a claimant must demonstrate that treatment has been prescribed by a treating source, that she is unable to afford that treatment, and that she has exhausted all free or subsidized sources of treatment. *See Gordon v. Schweiker*, 725 F.2d 231, 237 (4th Cir. 1984). Plaintiff failed to meet each of these requirements.

Plaintiff submitted only one piece of evidence from a treating source: the August 2005 electromyography report (EMG) diagnosing right carpal tunnel syndrome and noting "symptoms suggestive of left carpal tunnel syndrome" (R. 140). The EMG did not prescribe surgery or any other treatment for the carpal tunnel syndrome, but simply advised that Plaintiff obtain further

13

studies. No evidence, then, exists in the record that Plaintiff was prescribed, but refused, surgery or other treatment for her carpal tunnel syndrome. In fact, she was receiving some treatment for the condition. She was taking Elavil for the pain and wore wrist braces (R. 17).

Similarly, the record does not contain any documentation as to Plaintiff's financial condition. During her testimony, she did not mention that she could not afford treatment. No other mention of her financial status or inability to pay for treatment exists in the record. The first and only time this justification was mentioned was in her brief. The record also does not demonstrate that there were no free sources of treatment available to her. It does indicate, rather, that she received medical assistance through Medicaid (R. 62).

The record thus contains no evidence that Plaintiff's carpal tunnel syndrome – or any of her other alleged conditions - is disabling because she cannot afford treatment. Plaintiff's argument is without merit. *See*, *e.g.*, *Tamez v. Sullivan*, 888 F.2d 334, 336 (5th Cir. 1989) (rejecting claimant's argument that his diabetes was disabling due to an inability to pay for treatment because the record only showed a single instance where he was unable to pay for a prescription).

Finally, Plaintiff's counsel also argues that the ALJ should have attempted to obtain Plaintiff's medical records prior to rendering an unfavorable decision that was based, in part, upon a lack of objective medical evidence to support Plaintiff's allegations. Social Security Ruling 96-7p states that "[n]o symptom or combination of symptoms can be the basis for a finding of disability, no matter how genuine the individual's complaints may appear to be, unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the

symptoms." While the claimant has the burden to prove her disability, including the responsibility to furnish medical evidence showing her impairment, 20 C.F.R. § 404.1512(a),(c), the Commissioner has a responsibility as well. The Commissioner, and her ALJ's, must "make every reasonable effort to help [the claimant] get medical reports from [her] own medical sources" prior to rendering an unfavorable decision." 20 C.F.R. § 404.1512(d). To make a just determination, in other words, the ALJ has a duty to fully and fairly develop the record, and this duty exists even when the claimant is represented by counsel. *See Lashley v. Sec'y of Health and Human Servs.*, 708 F.2d 1048, 1051 (6th Cir. 1983). But this does not mean that the ALJ should assume the role of counsel. *Richardson v. Perales*, 402 U.S. 389, 411 (1971) ("The social security hearing examiner furthermore does not act as counsel. He acts as an examiner charged with developing the facts."). Whether the ALJ has acted as counsel or failed to fully develop the record must be determined on a case by case basis. *Lashley*, 708 F.2d at 1052. When the claimant is represented in the proceedings, the ALJ is entitled to rely on the claimant's counsel to "structure and present claimant's case in a way that the claimant's claims are adequately explored." *Hawkins v. Chater*, 113 F.3d 1162, 1167 (10th Cir. 1997). Thus, the claimant's counsel must, at the least, identify any additional information that is sought. *Hawkins*, 113 F.3d at 1167. If such information is identified, or if the ALJ otherwise has a reasonable basis to believe that relevant medical evidence might be available, she must attempt to obtain that evidence.

At her hearing, Plaintiff stated that she regularly saw Drs. Campbell and Kazilion (phonetic) (R. 156). She also identified having seen Dr. Treece (R. 163). Plaintiff's counsel

stated that he was attempting to obtain medical records from Dr. Campbell, Dr. Treece, and also Bicounty (phonetic) Hospital (R. 145). He told the ALJ that:

> I think when the Court has a chance to review the rest of the medicals combined with the testimony of my client regarding the things she cannot do, I think the Court will find that there is not work available that she can do within the economy.

(R. 168). At the August 31, 2005, hearing, the attorney requested and was granted a 30-day extension to submit these medical records. On October 1, 2005, after only the EMG report was submitted, he requested an additional 30 days. This request was also granted. But the ALJ received nothing additional. More than 100 days after this second request, the ALJ, still without any records from Drs. Campbell, Kazilion, or Treece, or from Bicounty Hospital, issued her decision.

Plaintiff's did not request additional time or assistance in obtaining the records, such as the issuance of a subpoena. *See* 20 C.F.R. § 404.950(d) ("When it is reasonably necessary for the full presentation of a case, an administrative law judge . . . may, on his or her own initiative or at the request of a party, issue subpoenas . . . for the production of . . . records, correspondence, or other documents that are material to an issue at the hearing."). Given Plaintiff's testimony that she saw her primary care physician, Dr. Campbell, twice a week (R. 156), and her foot doctor, Dr. Kazilion, once every two weeks (R. 157), it is not un reasonable for the ALJ to assume that Plaintiff had seen these treating sources multiple times in the four months since the hearing, and that they had no records or additional input helpful to Plaintiff's case. Nor is there any reason to believe Dr. Teese, who treated her fluttering heart condition solely with aspirin and her carpal tunnel syndrome, had any information suggesting these impairment were any more significant than Plaintiff testified to at the hearing (R. 162-63), and which could not be accommodated by

16

limiting Plaintiff to a restricted range of light and sedentary work and limiting bilateral hand use to occasional.

Plaintiff's attorney did not specify the relevance of the medical records in her request for review nor has he submitted any medical records to this Court suggesting that any material medical evidence was not considered by the ALJ. Given these circumstances, it cannot be said that the ALJ committed reversible error in proceeding with her decision 100 days after the second extension for additional submissions and her assuming that all relevant medical evidence helpful to Plaintiff had been provided.

### III. RECOMMENDATION

For the reasons stated above, it is Recommended that Plaintiff's Motion for Summary Judgment be DENIED, and Defendant's Motion for Summary Judgment be GRANTED. The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall not be more than twenty (20) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: June 29, 2007　　　　　　　　　　　　　　　s/ Steven D. Pepe
Flint, Michigan　　　　　　　　　　　　　　　　　United States Magistrate Judge

### Certificate of Service

I hereby certify that on June 29, 2007, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following: Janet L. Parker, AUSA, Norton J. Cohn, Esq., and I hereby certify that I have mailed by United States Postal Service the paper to the following non-ECF participants: Andrea L. Hamm, 600 W. Lafayette, 4th. Floor, Detroit, MI 48226, Social Security Administration - Office of the Regional Counsel, 200 W. Adams, 30th. Floor, Chicago, IL 60606

　　　　　　　　　　　　　　　　　　　　　　　s/James P. Peltier
　　　　　　　　　　　　　　　　　　　　　　　James P. Peltier
　　　　　　　　　　　　　　　　　　　　　　　Courtroom Deputy Clerk
　　　　　　　　　　　　　　　　　　　　　　　U.S. District Court
　　　　　　　　　　　　　　　　　　　　　　　600 Church St.
　　　　　　　　　　　　　　　　　　　　　　　Flint, MI 48502
　　　　　　　　　　　　　　　　　　　　　　　810-341-7850
　　　　　　　　　　　　　　　　　　　　　　　pete_peltier@mied.uscourts.gov